UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

PHILIP RALPH BELPASSO,

                              Plaintiff,

        -against-

CITY OF NEW YORK; NEW YORK CITY PARKS
ENFORCEMENT PATROL CAPTAIN ZELMA CRUZ and
SERGEANT CHARLEMAGNE in their individual and official capacities;
NEW YORK CITY PARKS ENFORCEMENT PATROL OFFICERS
THOMAS POMPOSELLO, DELANO DORSAINT, D. FLAHERTY,
P. IENER in their individual and official capacities; "JOHN DOE"
NEW YORK CITY PARKS AND RECREATION
JOB TRAINING PARTICIPANTS 1-3 in their individual
and official capacities,

                              Defendants.

-------------------------------------------------------------X

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____                  │
│ DATE FILED: 8/15/13                  │
└─────────────────────────────────────┘
```

AMENDED COMPLAINT

12 Civ. 9010

JURY TRIAL DEMANDED

        Plaintiff Philip Belpasso, appearing *pro se,* respectfully alleges upon personal knowledge

as to his own acts and status, and upon information and belief as to all other matters:

## PRELIMINARY STATEMENT

1.      This is an action for money damages and injunctive relief brought under 42 U.S.C. §

1983, 1985 and the First and Fourteenth Amendments of the Constitution of the United States,

against Defendants for committing acts, under color of state law, with the intent and for the

purpose of depriving the Plaintiff of rights secured under the Constitution of the United States.

2.      This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343, and 42

U.S.C. §§ 1983 and 1988.  The declaratory and injunctive relief sought is authorized by 28

U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983 and Rule 57 of the Federal Rules of Civil Procedure.

3.      Plaintiff brings this action to seek redress for damages incurred due to the Defendants'

1



systematic campaign of summonsing, intimidation and physical assault to prevent the Plaintiff

from lawfully playing his flute in Battery Park. The Plaintiff was wrongfully driven from the

Sphere in Battery Park, where he regularly played the flute for several years, in violation of his

federal constitutional rights to free speech.

## PARTIES

4.      Plaintiff PHILIP BELPASSO ("herein after referred to as "Mr. Belpasso") is a musician

and flautist who has performed in the streets and parks of New York City for over forty years.

He is a resident of Fair Lawn, New Jersey.

5.      Defendant CITY OF NEW YORK (hereinafter referred to as the "City") is a municipal

entity created and authorized under the laws of the State of New York. It is authorized under the

New York City Charter § 533 to maintain the New York Department of Parks and Recreation

("Parks Department"), which acts as its agent in the area of maintenance and operation of City

park land, and for which it is ultimately responsible. The City assumes the risks incidental to the

maintenance of a parks department and the employment of Parks' officials and officers. Parks

operations include the operations described herein.

6.      Defendant Zelma Cruz ("Captain Cruz") is and/or was at all times material to the

allegations in this complaint acting in her capacity as a Captain in the New York City Parks

Enforcement Patrol ("PEP") and employed by the City, and was acting under color of state law.

She is sued in her individual and official capacities.

7.      Defendant Charlemagne is and/or was at all times material to the allegations in this

complaint acting in his/her capacity and employed by the City as a Sergeant in the New York

City Parks Enforcement Patrol, and was acting under color of state law. Sergeant Charlemagne

is sued in his/her individual and official capacities.

2

8.      Defendant Thomas Pomposello (hereinafter referred to as "Officer Pomposello") is and/or was at all times material to the allegations in this compliant acting in his capacity as a PEP Officer and employed by the City, and was acting under color of state law.  He is sued in his individual and official capacities.

9.      Defendant Delano Dorsaint (hereinafter referred to as "Officer Dorsaint") is and/or was at all times material to the allegations in this complaint acting in his capacity as a PEP Officer employed by the City, and was acting under color of state law.  He is sued in his individual and official capacities.

10.     Defendant D. Flaherty (hereinafter referred to as "Officer Flaherty") is and/or was at all times material to the allegations in this complaint acting in his capacity as a PEP Officer employed by the City, and was acting under color of state law.  He is sued in his individual and official capacities.

11.     Defendant P. Iener (hereinafter referred to as "Officer Iener") is and/or was at all times material to the allegations in this complaint acting in his capacity as a PEP Officer employed by the City, and was acting under color of state law.  He is sued in his individual and official capacities.

12.     Defendants "John Doe" New York City Parks and Recreation Job Training Participants (hereinafter referred to as "JTPs") 1-3 are at all times material to the allegations in this complaint acting in their capacity as job training participants working for the Parks Department and employed by the City, and were acting under color of state law.  They are sued in their individual and official capacities.

## ALLEGATIONS OF FACT

13.    Mr. Belpasso is a sixty-six year old flautist who has performed in New York City streets and parks for over forty years.

14.    From 1981 until 2001, Mr. Belpasso regularly played the flute in front of the Metropolitan Museum of Art on Manhattan's east side.

15.    On September 11, 2011, a series of coordinated terrorist attacks upon New York City destroyed the World Trade Center ("WTC") towers in lower Manhattan, resulting in over three thousand deaths. Mr. Belpasso knew more than twenty people who perished in the September 11, 2001 attacks, including his nephew.

16.    In order to honor the memory of those lost, Mr. Belpasso began playing the flute for donations in front of a temporary Church Street Memorial, located a block away from the WTC site.  Mr. Belpasso chose this location to also provide comfort to visitors to the WTC site through his traditional-style and patriotic music.

17.    The Church Street Memorial was closed to pedestrians in 2007, so Mr. Belpasso began playing near "The Sphere" in Battery Park located at the southern tip of Manhattan. "The Sphere" is a large metallic sculpture that once stood between the WTC towers.  After being recovered from the rubble of the attacks of September 11, 2001, it was moved to Battery Park. An eternal flame was ignited next to the Sphere on September 11, 2002, when it was formally dedicated to the victims of the September 11, 2001 attacks.

18.    Mr. Belpasso played the flute at the Sphere six to seven days a week in order to continue his musical tribute to his nephew and others who died in the September 11, 2001 attacks.

19.    Mr. Belpasso kept an open flute case directly in front of him just in case anyone wanted to contribute donations, but did not otherwise actively solicit funds.  He does not sell anything.

4

### Parks Department Rules Governing Performers and "Expressive Matter Vendors"

20.     New York City Parks Rules and Regulations Title 56 ("RCNY") § 1-05(b), as they

existed in 2011, prohibited unlawful vending in New York City parks.  The regulation states that

"no person in or on any property under the jurisdiction of the Department shall sell, offer for

sale, lease, or let anything whatsoever, including, but not limited to goods, services, or provide or

offer services or items in exchange for a donation, except under and within the terms of a permit,

or except as otherwise provided by law."

21.     Under First Amendment jurisprudence, persons selling expressive matter or playing a

musical instrument without amplification in a city park are not required to obtain a permit.

22.     General vendors who are subject to the permit requirement must pay permit fees to the

Parks Department.  Expressive matter vendors and performers do not have to pay permit fees to

the Parks Department, as they are exempt from the permit requirement.

23.     There are limited exceptions to the no-permit requirement for persons playing a musical

instrument, enumerated in RCNY § 1-05(d)(2)-(3), which include requiring a person operating a

sound reproduction device, or playing a musical instrument between the hours of 10:00pm and

8:00am, to obtain a permit.

24.     In June 2010, the Parks Department adopted new rules ("2010 EMV rules") governing

where expressive matter vendors could vend in New York City parks.

25.     The Parks Department stated that the 2010 EMV rules were promulgated to promote the

interests of "alleviating congestion and improving circulation, promoting aesthetics by

preserving the integrity of the overall design of the parks."

26.    "Expressive matter" was statutorily defined in RCNY § 1-02 as "materials or objects with expressive content, such as newspapers, books, or writings, or visual art such as paintings, prints, photography, or sculpture."

27.    RCNY §§ 1-05(b)(4)-(8) was amended in 2010 to restrict places where expressive matter vendors using display stands may operate within four general areas of New York City Parks, which includes the entire area of Battery Park.

28.    RCNY § 1-05(b)(3) was amended in 2010 to prohibit EMVs in Battery Park unless vending in a designated spot for such vending.

29.    The Parks Department issued an FAQ with the release of the rules, which included maps of Battery Park and the locations of the designated EMV spots in the park.  The maps indicated that there are only nine such designated spots, and all of them are located along the perimeter of the park. Not a single spot is located in the interior of Battery Park.

30.    The 2010 EMV rules do allow for vending outside of the designated spots, but only if they are vending expressive matter "without a cart, display stand or other device, and without occupying a specific location for longer that necessary to conduct a transaction."

31.    The Parks Department Commissioner's proffered purposes of the 2010 EMV rules were to "provide reasonable opportunities – by and through limited time, place and manner restrictions – for expressive matter vendors to display and sell their wares on parkland."

32.    An FAQ published by the Parks Department in June 2010 explains that the expressive matter rules apply to "anyone who sells art, photography, reading material, or sculpture whether original or mass produced."

33.    The FAQ also notes restrictions of the size of display stands to 8 feet long by 3 feet wide, and 5 feet high.

34.    The 2010 EMV rules went into effect in May 2011 after a New York State court struck

down a temporary restraining order that had been effect since June 2010.

35.    The EMV rules expressly apply to vendors of visual art who use display stands in City

Parks, not to buskers and musicians performing in parks with open instrument cases who seek

donations.

36.    Without warning in October 2011, the Parks Department issued hundreds of summonses

to performers and musicians in New York City parks, particularly in Washington Square Park.

37.    After a huge public outcry and extensive media coverage, the Parks Department stopped

enforcing the EMV rules against performers and musicians, and many of the summonses and

tickets issued against them were dismissed.

### Defendants Seek to Drive Mr. Belpasso from Battery Park

38.    Prior to 2011, Mr. Belpasso had never been ticketed or summonsed for playing the flute

in a City park.

39.    In September 2011, the tenth anniversary of the September 11th attacks, Parks

Enforcement Patrol ("PEP") officers began approaching Mr. Belpasso in Battery Park while he

was performing there.  They demanded that he stop playing the flute and leave the park.

40.    Mr. Belpasso is aware of his First Amendment right to perform in City parks.  He

consistently challenged PEP officers' legal basis for demanding that he leave the park.

41.    On September 10, 2011, Officer Pomposello issued a Notice of Violation ("NOV")

against Mr. Belpasso for "vending expressive matter in a non designated area" and "not in the

designated spot."  In the NOV, Officer Pomposello also alleged that Mr. Belpasso "took longer

than necessary to conduct transaction."  The NOV states a fine of $250 for the alleged violations.

42.     Much of the September 10, 2011 NOV is illegible, and appears to cite to "1-cc(b)(3)" of the 2010 EMV Park Rules.

43.     Mr. Belpasso challenged the September 10, 2011 NOV before the Environmental Control Board ("ECB") on grounds that he was not vending "materials or objects" as defined in RCNY § 1-02.  The Administrative Law Judge ("ALJ") did not rule on the merits of Mr. Belpasso's claim, but dismissed the NOV on grounds that failed to set forth a prima facie case, because the face of the summons was illegible.

44.     Subsequently, Mr. Belpasso was approached several other times by PEP officers who threatened him with more summonses and tickets if he did not leave Battery Park and move to a vending location.  Despite continued threats of summonses and tickets, Mr. Belpasso continued playing his flute at the Sphere in Battery Park to mark the tenth anniversary of the 2001 tragedy and to honor the fallen victims.

45.     On October 15, 2011, Mr. Belpasso was playing the flute near the boat dock in Battery Park.  He was approached by Officer Dorsaint and Sergeant Charlemagne.

46.     Sergeant Charlemagne demanded that Mr. Belpasso leave Battery Park, then proceeded to kick Mr. Belpasso on the lower foot near the back of his shoes, until Mr. Belpasso was outside of Battery Park.  Mr. Belpasso stopped on the perimeter of Battery Park, where Sergeant Charlemagne continued to kick the back of his feet even harder, in order to push Mr. Belpasso further away from the park.

47.     After Mr. Belpasso was kicked and pushed out of Battery park, Officer Dorsaint, under the direction of Sergeant Charlemagne, issued an NOV against Mr. Belpasso for failing to vend in a designated location in violation of "56 RCNY 105(b)," and on grounds that he occupied the location longer than necessary to conduct a transaction.  Mr. Belpasso was fined $250.

8

48.     On October 15, 2011, Officer Dorsaint, under the direction of Sergeant Charlemagne, issued another NOV against Mr. Belpasso for "failing to vend in a designated location," and on grounds that he "occupied the location longer than necessary to conduct a transaction." Mr. Belpasso was fined $250.

49.     Mr. Belpasso challenged the October 15, 2011 NOV before the ECB, arguing that as a musician and flute player he was not an expressive matter vendor because he was not vending "materials or objects" as defined by RCNY § 1-02.  Furthermore, Mr. Belpasso argued that he was not under the Parks Department jurisdiction, as he was fined on the perimeter of the park, and not in Battery Park itself.  The ALJ did not rule on the merits of Mr. Belpasso's claims, and dismissed the October 15, 2011 NOV for failing to give proper notice to the Plaintiff, as the summons improperly cited to 56 RCNY 105(b), and not 56 RCNY § 1-05(b).

50.     During September and October 2011, Mr. Belpasso was approached by Officers Dorsaint, Pomposello, Flaherty, and Iener numerous times, often at the direction of Captain Cruz who was in the vicinity, and threatened with summonses and tickets unless he stopped playing the flute and leave Battery Park.

51.     Sometime in or around October 2011, Mr. Belpasso was surrounded and intimidated by three unnamed Parks employees.  Upon information and belief, these individuals were part of a Parks Department welfare to work program known as the Job Training Participants ("JTPs") program, and acted under the direction of Captain Cruz.

52.     The JTPs usually arrived at Battery Park in a van.  They did not wear the same uniforms as PEP officers, but wore greens shirts with the Parks Department insignia.

53.    The JTPs approached Mr. Belpasso at least once a week, usually when no other park

goers where in the area. When no one was looking, the JTPs, who the plaintiff reasonably

believes acted under the direction and supervision of Captain Cruz, would surround Mr.

Belpasso and make threatening gestures and comments to him.

54.    On more than one occasion, the JTPs kicked Mr. Belpasso around the lower part of his

foot and ankles in order to remove him from Battery Park. Mr. Belpasso, fearful for his safety

and physical well being, would leave the park when attacked by the JTPs.

55.    Nevertheless, Mr. Belpasso would return to Battery Park the next day and play his flute,

as he continued to believe he had a right to do so.

56.    On October 21, 2011, Officer Iener approached the Plaintiff while he was performing in

Battery Park. At the direction of Captain Cruz, Officer Iener ordered Mr. Belpasso to leave the

park or he would be issued an NOV.

57.    Mr. Belpasso told Officer Iener that he was legally performing in Battery Park, and

would challenge an NOV before the ECB and have the NOV dismissed.

58.    Officer Iener, angered by Mr. Belpasso's persistence and refusal to give up his right to

perform in Battery Park, threatened him with criminal sanctions.

59.    Mr. Belpasso still refused to move or stop playing the flute.  Officer Iener, at the

direction of Captain Cruz, then gave Mr. Belpasso two criminal summonses, one for "unlawful

vending," and a second for "failure to comply."

60.    The first criminal summons for unlawful vending was dismissed by a New York City

Criminal Court on January 5, 2012, on grounds that the summons was legally insufficient.

61.    The second criminal summons for failure to comply was dismissed on January 11, 2012, on grounds that a legally acceptable accusatory instrument was never filed by the New York City Police Department.

62.    On December 12, 2011, Mr. Belpasso was approached again by Officer Flaherty while performing at the Sphere.   Officer Flaherty demanded that he leave the park and move to a vending location outside of the park.  Mr. Belpasso refused and Officer Flaherty issued two NOVs against Mr. Belpasso.

63.    The first NOV cited Mr. Belpasso for "unauthorized vending," stating that he was "playing a musical instrument – flute – solicit and accept donations in an unauthorized area and not in a designated spot as defined by PRR 1-05(b)(3)(ii)."  The NOV further stated that Mr. Belpasso "accepted multiple donations in this spot for a period of 5 minutes."  The NOV was for a fine of $250.

64.    Officer Flaherty told Mr. Belpasso to move to a designated area outside of the park.  Mr. Belpasso refused.  Officer Flaherty then issued the second NOV for "fail to comply w. officer directive" in violation of "56 RCNY 1-03(c)(1)," and stated that "respondent refused to go to a designated EMV spot."  The second NOV was for a fine of $250.

65.    Soon after the December 12, 2011 NOVs, Mr. Belpasso stopped performing in Battery Park.  Mr. Belpasso was overwhelmed by the Defendants' persistent and continuous harassment and intimidation.  Mr. Belpasso left his spot near the Sphere, and now performs near Wall Street.

**The ECB upholds an illegal NOV**

66.    Belpasso challenged the December 12, 2011 NOVs before the ECB. A hearing was held on January 25, 2012 and the ECB incredulously upheld both NOVs.

67.     The ECB glossed over the obvious fact that RCNY § 1-02 does not even mention musical

performance or playing a musical instrument to uphold the first NOV for unauthorized vending,

stating that RCNY § 1-02 is not exclusive and not limited to those activities listed in the

regulation, namely "materials or objects with expressive content, such as newspapers, books, or

writings, or visual art such as paintings, prints, or photography."

68.     The ECB's unilateral expansion of the statutory language to include musical

performances contravenes this Circuit's jurisprudence strictly defining "expressive matter" as

wares such as "prints, painting, photographs, and sculpture" and nothing else.

69.     The ECB upheld the second NOV for failure to comply, stating that "there is no evidence

or testimony he [Mr. Belpasso] complied by moving to a designated spot."

70.     Mr. Belpasso filed an appeal of the ECB decision with the ECB Appeals Unit on

February 6, 2012.

71.     Inexplicably, and contrary to the overwhelming weight of First Amendment

jurisprudence in this Circuit, the ECB Appeals Unit denied Mr. Belpasso's appeal of the first

NOV for unauthorized vending.  The ECB Appeals Unit held that Mr. Belpasso "was vending

without a permit in violation of 56 RCNY 1-05(b)" because he was "providing or offering to

provide services or items in exchange for a donation."  The ECB Appeals Unit held that Mr.

Belpasso needed a permit, despite well established law that a person performing a musical

instrument in a City park without amplification and during the daytime does not need a permit.

72.     The ECB Appeals Unit ruled in favor of Mr. Belpasso's appeal of the second NOV,

holding that he had no duty to comply with Officer Flaherty's order to move to an EMV spot on

the perimeter of Battery Park, because as a flute player he was not an EMV as defined under the

2010 EMV rules.

### Parks Department revises 2010 EMV rules to include performers

73.    In May 2013, nearly a year and a half after the aforementioned events, the Parks

Department adopted new rules [2013 revised rules] that expanded the definition of expressive

matter under RCNY § 1-02 to include "entertainers."

74.    In addition, the Parks Department revised RCNY § 1-05(b) prohibition on unlawful

vending, to state that no person shall sell, offer, lease or let anything whatsoever, including, but

not limited to goods, services, *or entertainment* [emphasis added] in exchange for a donation,

except under and within the terms of a permit, or except as a otherwise provided by law.

75.    With the 2013 revised rules, the Parks Department issued a FAQ [2013 FAQ] to explain

how those rules would apply to musicians and performers in city parks.

76.    The 2013 FAQ stated that "the Agency [Parks Department] in spring 2012 determined

that it was necessary to temporarily suspend enforcing the rules against performers and clarify

that the rules apply to performers and entertainers."

77.    The 2013 FAQ explains that "Parks will resume applying the rules to performers and

entertainers."  It further states that in the four parks with designated vending spots (Union

Square, Battery Park, High Line and certain portions of Central Park), performers, like other

expressive matter vendors, will need to sell or solicit donations from the designated spots."

78.    The 2013 revised rules do not apply to the Plaintiff's causes of action, as they were not in

effect in 2011 when the NOVs and criminal summonses issued against Mr. Belpasso, and when

the harassment and assaults took place.

### CAUSES OF ACTION

### COUNT ONE
### Constitutional and Civil Rights pursuant to 42 U.S.C. § 1983
### Violation of First Amendment Speech rights
### (Against all Defendants)

13

79.     The foregoing allegations are incorporated as if re-alleged herein.

80.     Battery Park is a public park and is in the public fora. Mr. Belpasso's flute playing and receiving donations in a public park is speech that enjoys the broadest protections under the First Amendment to the U.S. Constitution.

81.     Mr. Belpasso did not need to obtain a permit to play his flute under the circumstances of which he was summonsed.

82.     The Defendants' harassment and ticketing the Plaintiff for violations of the 2010 EMV rules constituted a singling out of the Plaintiff for enforcement under a rule that does not apply to him.  As such, the application of the 2010 EMV rules to the Plaintiff was a content-based restriction that violates the First Amendment to the United States Constitution.

83.     The fact that a majority of the NOVs and criminal summonses issued to Mr. Belpasso were dismissed by the ECB and New York City Criminal Court does not moot his claims.  None of the NOVs or criminal summonses were dismissed on First Amendment grounds.  Rather, they were dismissed on technical or procedural grounds.

84.     The Defendants' consistent harassment, demands that he leave the park, and issuing of NOVs and criminal summonses against the Defendant were based on a Defendants' strong disagreement with the Plaintiff's constitutional right to receive donations for playing the flute in a public park.

85.     The harassment, NOVs, and criminal summonses were a content based restriction that served no compelling governmental interest.

86.     The ticketing and harassment were not narrowly tailored to accomplish any compelling governmental interest, nor were they a reasonable restriction on the time, place and manner of his protected speech.

14

87.    The Defendants' harassment and ticketing of the Defendant was not narrowly tailored to

serve its proffered interests in alleviating pedestrian congestion and enhancing the aesthetic value

of Battery Park.  There is no evidence that Mr. Belpasso's flute playing and seeking donations

caused attracted large crowds or prevented the free flow of pedestrian traffic in Battery Park.

Nor is there evidence that Mr. Belpasso's presence near the Sphere lessened the aesthetic value

of Battery Park.

88.    The Plaintiff is no longer able to perform in Battery Park, and has no ample alternative

channels of communication.  Mr. Belpasso specifically chose to perform by the Sphere in Battery

Park in order to continue his tribute to those that lost their lives in the September 11, 2001

terrorist attacks, including his nephew.  By the Defendants persistent ticketing and harassment,

the Plaintiff has been deprived of access to the Sphere were he can properly perform his music,

and there are no other locations in New York City parks that provide an adequate replacement.

89.    The Defendants acted intentionally or negligently with callous disregard for Mr.

Belpasso's clearly established rights. Because of the Defendants violations of Mr. Belpasso's

constitutional rights, he has suffered severe and substantial damages.  Those damages include

physical injury to his ankle and lower leg, lost business opportunities, loss of reputation,

humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other

compensatory damages, in an amount to be determined by a jury and the Court.

**COUNT TWO**
**Constitutional Violations pursuant to 42 U.SC. § 1983**
**Violation of Plaintiff's Fourteenth Amendment Due Process Rights**
**(Against all Defendants)**

90.    The foregoing allegations are incorporated as if re-alleged herein.

91.    The 2010 EMV rules, as applied to the Plaintiff, violated his Fourteenth Amendment

rights in that they were unconstitutionally vague.

92.     The Defendants interpretation of the definition of expressive matter as contained in RCNY § 1-05 in the 2010 EMV rules was unconstitutionally vague, and implicates the Plaintiff's First Amendment rights.  Thus, the Defendants' application of RCNY § 1-05(b), as it stood in 2010, warrants greater scrutiny.

93.     The language of RCNY § 1-25 in the 2010 EMV rules failed to provide a person of ordinary intelligence a reasonable opportunity to understand that musical performers may only perform in designated locations in Battery Park.  RCNY § 1-02 defined expressive matter as "materials or objects with expressive content, such as newspapers, books, or writings, or visual art such as paintings, prints, photography, or sculpture."

94.     RCNY § 1-02 makes no mention of performing or playing a musical instrument.  Thus, the regulation fails to give adequate notice to the Plaintiff that playing a flute in Battery Park is vending expressive matter that can only be done in one of the designated locations outside of the park as described in RCNY § 1-05(b)(3)(ii).

95.     The very fact that the Parks Department had to issue revised rules in order to clarify RCNY § 1-02 to add "entertainers" to the list of expressive matter activities highlights the fact that the 2010 EMV rules were unconstitutionally vague as applied to Plaintiff.

96.     The 2010 EMV rules were also unconstitutionally vague in that they failed to give minimal guidance to the Defendants so as to prevent arbitrary and discriminatory enforcement of the rules.

97.     Because Defendants were allowed to add musical performance to the list of specifically enumerated activities that are expressive matter under RCNY § 1-05(b), the potential for arbitrary and discriminatory enforcement, which occurred here, was great.

98.     Mr. Belpasso was issued NOVs and criminal summonses under RCNY § 1-05(b), for

failing to vend in a designated spot, and failing to comply with PEP officers' directives to vend

in a designated spot, all in violation of his Fourteenth Amendment Due Process rights, because

the 2010 EMV Rules were unconstitutionally vague.

99.     Because of the Defendants violations of Mr. Belpasso's Fourteenth Amendment Due

Process rights, he has suffered severe and substantial damages.  Those damages include physical

injury to his ankle and lower leg, lost business opportunities, loss of reputation, humiliation,

embarrassment, inconvenience, mental and emotional anguish and distress and other

compensatory damages, in an amount to be determined by a jury and the Court.

**COUNT THREE**
**Constitutional Violations Pursuant to 42 U.S.C. §1983**
**Violation of Plaintiff's Fourteenth Amendment Substantive Due Process Rights**
**(Against Sergeant Charlemagne, Captain Cruz and John Doe Parks Department JTP**
**employees 1-3)**

100.    The foregoing allegations are incorporated as if re-alleged herein.

101.    Sergeant Charlemagne and the three unnamed Parks Department JTP employees, under

the direction of Captain Cruz, violated the Plaintiffs 14th Amendment Substantive Due Process

guarantee to be protected from conscience shocking exercises of power by governmental actors.

102.    Sergeant Charlemagne and the Parks Department JTP employees acting under the

direction of Captain Cruz malicious and sadistic conduct of harassing, intimidating, and

physically kicking the Plaintiff in the ankle and lower leg area was employed for the very

purpose of causing harm to him, and preventing him from exercising his First Amendment rights

to play the flute in Battery Park.

103.    Sergeant Charlemagne and the Parks Department JTP employees acting under direction

of Captain Cruz caused injury to the Plaintiff.

17

104.     The Park Department JTP employees' malicious conduct of kicking the Plaintiff occurred

on multiple occasions, all while, upon information and belief, Captain Cruz was standing nearby

and overseeing their violent conduct, shocks the conscience.

105.     On October 21, 2011, Sergeant Charlemagne kicked the Plaintiff's lower ankle and back

of his shoe in order to push him from the waterfront area of Battery Park to the outside of the

park.  Officer Charlemagne's deliberate and malicious conduct shocks the conscience.

106.     Because of Sergeant Charlemagne's and the Parks Department JTP employees' violation

of the Plaintiff's Fourteenth Amendment Substantive Due Process rights, and Captain Cruz's

supervision and direction of those violations, the Plaintiff has suffered severe and substantial

damages.  Those damages include injury to his ankle, humiliation, embarrassment,

inconvenience, mental and emotional anguish and distress and other compensatory damages, in

an amount to be determined by a jury and the Court.

### COUNT FOUR
### Violations of Constitutional Rights Pursuant to 42 U.S.C. § 1985
### Conspiracy to deprive the Plaintiff of his Constitutional Rights
### (Against all Defendants)

107.     The foregoing allegations are incorporated as if re-alleged herein.

108.     The Defendants actively conspired to deprive the Plaintiff of his First and Fourteenth

Amendment rights.

109.     Overt action was taken by Officer Pomposello on September 10, 2011, when he issued an

NOV to the Plaintiff, who was not vending any materials or goods, for not vending in a

designated area of Battery Park.

110.     A meeting of the minds was clearly present when the Defendants escalated their

campaign to prevent the Plaintiff from lawfully playing his flute in Battery Park for donations.

18

111.    Mr. Belpasso was approached several times between September 2011 and December 2011 by Officers Pomposello, Dorsaint, Flaherty, and Iener, who demanded that the plaintiff stop playing the flute and leave Battery Park.

112.    Officers Pomposello, Dorsaint, Flaherty and Iener all issued NOVs and summonses against the Plaintiff in violation of his rights.

113.    Sergeant Charlemagne, with Officer Dorsaint present, attacked the Plaintiff and kicked him in the lower ankle and back of his foot until he left Battery Park.  Sergeant Charlemagne then directed Officer Dorsaint to issue an unlawful NOV against the Plaintiff for unauthorized vending and staying in a location longer than necessary to conduct a transaction.

114.    Officer Iener, knowing that the Plaintiff was within his rights to perform in Battery Park, maliciously issued criminal summonses against the Plaintiff after Mr. Belpasso informed him that he would challenge an NOV and have it dismissed.

115.    In the most egregious act of the conspiracy, clearly establishing a meeting of the minds among the Defendants, Mr. Belpasso was physically attacked by Parks Department JTP workers, whom the Plaintiff reasonably believes acted under the direction and supervision of Captian Cruz.

116.    The Defendants committed the foregoing acts intentionally, willfully, and with malicious disregard for the Plaintiff's rights and are therefore liable for punitive damages in addition to compensatory and punitive damages.

**Liability of the City of New York for violations of the Plaintiff's rights, pursuant to _Monell_**

117.    The foregoing allegations are incorporated here as if re-alleged herein

118.    The City of New York is liable to the Plaintiff for the unconstitutional acts of its employee PEP officers and Parks Department officials.

19

119.     The City of New York adopted an unwritten official policy to deprive the Plaintiff of his constitutional rights.

120.     Top officials at the Parks Department, directed and oversaw the unlawful NOVs issued against the Plaintiff, and the physical attacks undertaken by Parks Department JTP employees against the Plaintiff.

121.     Sergeant Charlemagne kicked the Plaintiff repeatedly, then directed Officer to Dorsaint to harass and issue NOVs against the Plaintiff, who was lawfully exercising his First Amendment rights to play his flute in Battery Park.

122.     Officers Pomposello and Flaherty issued repeated warnings and NOVs to the Plaintiff, all in violation of his First Amendment rights.

123.     Captain Cruz, in charge of enforcement policy and the actions of PEP officers, directed Officer Iener to issue criminal summonses against Mr. Belpasso for exercising his First Amendment rights, knowing that unlawful NOVs would not stand up in administrative court.

124.     Upon information and belief, Captain Cruz ordered the violent attacks against Mr. Belpasso committed by Parks Department JTP employees.

125.     Mr. Belpasso challenged all of the NOVs and criminal summonses in administrative court, putting the City of New York on notice of the violations of his constitutional rights.

126.     Around the same time, PEP officers and Parks Department officials were issuing illegal summonses against performers in other parks throughout the City, including Washington Square Park.

127.  All of the aforementioned conduct by the Defendants shows a widespread pattern of conduct that constitutes a custom and usage with the force of law, and the acquiescence of senior

policy making officials, all of which caused the deprivation of the Plaintiff's constitutional rights.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff Philip Ralph Belpasso seeks judgment against Defendants as follows:

A.  For appropriate compensatory damages in an amount to be determined at trial;

B.  For appropriate pecuniary and punitive damages in an amount to be determined at trial;

C.  For declaratory relief proclaiming that the Plaintiff's constitutional rights were violated, that the December 12, 2011 Notice of Violation is null and void, and that the $250 fine for the Notice of Violation is null and void; and for declaratory relief that the Expressive Matter Rules are unconstitutionally vague as applied to the Plaintiff;

D.  For appropriate equitable relief, including enjoining and permanent restraining of these violations; and

E.  For such and further relief the Plaintiff may show himself to be justly entitled.

July 16, 2013

Respectfully Submitted,

Philip Belpasso