UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
PHILIP RALPH BELPASSO,

                                 Plaintiff,            **SECOND AMENDED COMPLAINT**

           -against-                                   12 Civ. 9010

CITY OF NEW YORK; NEW YORK CITY PARKS               JURY TRIAL DEMANDED
ENFORCEMENT PATROL CAPTAIN ZELMA CRUZ and
SERGEANT CHARLEMAGNE in their individual and official capacities;
NEW YORK CITY PARKS ENFORCEMENT PATROL OFFICERS
THOMAS POMPOSELLO, DELANO DORSAINT, D. FLAHERTY,
P. IENER in their individual and official capacities,
                                 Defendants.
--------------------------------------------------------------X


          Plaintiff Philip Belpasso, through his attorney Ari Ambrose, Esq., respectfully alleges

upon personal knowledge as to his own acts and status, and upon information and belief as to all

other matters:

## PRELIMINARY STATEMENT

1.        This is an action for money damages and injunctive relief brought under 42 U.S.C. §

1983, 1985 and the First and Fourteenth Amendments of the Constitution of the United States,

against Defendants for committing acts, under color of state law, with the intent and for the

purpose of depriving the Plaintiff of rights secured under the Constitution of the United States.

2.        This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343, and 42

U.S.C. §§ 1983 and 1988.  The declaratory and injunctive relief sought is authorized by 28

U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983 and Rule 57 of the Federal Rules of Civil Procedure.

3.        The Plaintiff brings this action to seek redress for damages incurred due to the

Defendants' systematic campaign of summonsing, intimidation and physical assault to prevent

him from lawfully playing his flute in Battery Park.  The Plaintiff was wrongfully driven from the Sphere in Battery Park, where he regularly played the flute for several years, in violation of his federal constitutional rights to free speech.

## PARTIES

4.    Plaintiff Philip Belpasso ("herein after referred to as "Mr. Belpasso") is a musician and flautist who has performed in the streets and parks of New York City for over forty years.  He is a resident of Fair Lawn, New Jersey.

5.    Defendant City of New York (hereinafter referred to as the "City") is a municipal entity created and authorized under the laws of the State of New York.  It is authorized under the New York City Charter § 533 to maintain the New York Department of Parks and Recreation ("Parks Department"), which acts as its agent in the area of maintenance and operation of City park land, and for which it is ultimately responsible.  The City assumes the risks incidental to the maintenance of a parks department and the employment of Parks' officials and officers.  Parks operations include the operations described herein.

6.    Defendant Zelma Cruz ("Captain Cruz") is and/or was at all times material to the allegations in this complaint acting in her capacity as a Captain in the New York City Parks Enforcement Patrol ("PEP") and employed by the City, and was acting under color of state law.  She is sued in her individual and official capacities.

7.    Defendant Charlemagne is and/or was at all times material to the allegations in this complaint acting in his/her capacity and employed by the City as a Sergeant in the New York City Parks Enforcement Patrol, and was acting under color of state law.  Sergeant Charlemagne is sued in his/her individual and official capacities.

8.    Defendant Thomas Pomposello (hereinafter referred to as "Officer Pomposello") is

2

and/or was at all times material to the allegations in this compliant acting in his capacity as a PEP Officer and employed by the City, and was acting under color of state law. He is sued in his individual and official capacities.

9.    Defendant Delano Dorsaint (hereinafter referred to as "Officer Dorsaint") is and/or was at all times material to the allegations in this complaint acting in his capacity as a PEP Officer employed by the City, and was acting under color of state law. He is sued in his individual and official capacities.

10.    Defendant D. Flaherty (hereinafter referred to as "Officer Flaherty") is and/or was at all times material to the allegations in this complaint acting in his capacity as a PEP Officer employed by the City, and was acting under color of state law. He is sued in his individual and official capacities.

11.    Defendant P. Iener (hereinafter referred to as "Officer Iener") is and/or was at all times material to the allegations in this complaint acting in his capacity as a PEP Officer employed by the City, and was acting under color of state law. He is sued in his individual and official capacities.

## ALLEGATIONS OF FACT

12.    Mr. Belpasso is a sixty-six year old flautist who has performed in New York City streets and parks for over forty years.

13.    From 1981 until 2001, Mr. Belpasso regularly played the flute in front of the Metropolitan Museum of Art on Manhattan's east side.

14.    On September 11, 2001, a series of coordinated terrorist attacks upon New York City destroyed the World Trade Center ("WTC") towers in lower Manhattan, resulting in over three

3

thousand deaths. Mr. Belpasso knew more than twenty people who perished in the September 11, 2001 attacks, including James Patrick Berger, a family member.

15.    Mr. Belpasso was responder at the WTC site within days of the September 11, 2001 attacks.  He has since been eligible for treatment under the World Trade Center Health Program, a program started pursuant to the James Zadroga Act, which provides testing and treatment for people who worked in the response and recovery operations after the September 11, 2001 attacks.

16.    In order to honor the memory of those lost, Mr. Belpasso began playing the flute for donations in front of a temporary Church Street Memorial, located near the WTC site.  He was drawn to the "Memorial Cross," a cross-shaped memorial in the center of the temporary Church Street Memorial.  Mr. Belpasso chose this location to also provide comfort to visitors to the WTC site through his traditional-style and patriotic music.

17.    The Church Street Memorial was closed to pedestrians in 2007.  After that, Mr. Belpasso began playing near "The Sphere" in Battery Park located at the southern tip of Manhattan.  "The Sphere" is a large metallic sculpture that once stood between the WTC towers.  After being recovered from the rubble of the attacks of September 11, 2001, it was moved to Battery Park. An eternal flame was ignited next to the Sphere on September 11, 2002, when it was formally dedicated to the victims of the September 11, 2001 attacks.

18.    Mr. Belpasso played the flute at the Sphere six to seven days a week in order to continue his musical tribute to his Mr. Berger and others who died in the September 11, 2001 attacks.  As such, Mr. Belpasso considers the Sphere and the eternal flame a psychological and spiritual magnet that holds a special place for him.  Mr. Belpasso had first hand knowledge that a Bible

was found intact at the center of the Sphere after the September 11, 2001 attacks, thus the Sphere was a spiritual place for him.

19.     Mr. Belpasso kept an open flute case directly in front of him just in case anyone wanted to contribute donations, but did not otherwise actively solicit funds.  He did not sell any material items or goods.

20.  Until September 2011, Mr. Belpasso played in Battery Park generally undisturbed by Parks PEP Officers.

21.  Mr. Belpasso was familiar with many of the PEP officers assigned to Battery Park.  PEP Officers wear all green uniforms with special patrolman shields.  PEP Officers have badges, which identify them.

**Parks Department Rules Governing Performers and "Expressive Matter Vendors"**

22.     New York City Parks Rules and Regulations Title 56 ("RCNY") § 1-05(b), as they existed in 2011, prohibited unlawful vending in New York City parks.  The regulation states that "no person in or on any property under the jurisdiction of the Department shall sell, offer for sale, lease, or let anything whatsoever, including, but not limited to goods, services, or provide or offer services or items in exchange for a donation, except under and within the terms of a permit, or except as otherwise provided by law."

23.     Under First Amendment jurisprudence, persons selling expressive matter or playing a musical instrument without amplification in a city park are not required to obtain a permit.

24.     General vendors who are subject to the permit requirement must pay permit fees to the Parks Department.  Expressive matter vendors and performers do not have to pay permit fees to the Parks Department, as they are exempt from the permit requirement.

25.    There are limited exceptions to the no-permit requirement for persons playing a musical instrument, enumerated in RCNY § 1-05(d)(2)-(3), which include requiring a person operating a sound reproduction device, or playing a musical instrument between the hours of 10:00pm and 8:00am, to obtain a permit.

26.    In June 2010, the Parks Department adopted new rules ("2010 EMV rules") governing where expressive matter vendors could vend in New York City parks.

27.    The Parks Department stated that the 2010 EMV rules were promulgated to promote the interests of "alleviating congestion and improving circulation, promoting aesthetics by preserving the integrity of the overall design of the parks."

28.    "Expressive matter" was statutorily defined in RCNY § 1-02 as "materials or objects with expressive content, such as newspapers, books, or writings, or visual art such as paintings, prints, photography, or sculpture."

29.    RCNY §§ 1-05(b)(4)-(8) was amended in 2010 to restrict places where expressive matter vendors using display stands may operate within four general areas of New York City Parks, which includes the entire area of Battery Park.

30.    RCNY § 1-05(b)(3) was amended in 2010 to prohibit EMVs in Battery Park unless vending in a designated spot for such vending.

31.    The Parks Department issued an FAQ with the release of the rules, which included maps of Battery Park and the locations of the designated EMV spots in the park.  The maps indicated that there are only nine such designated spots, and all of them are located along the perimeter of the park. Not a single spot is located in the interior of Battery Park.

32.    The 2010 EMV rules do allow for vending outside of the designated spots, but only if they are vending expressive matter "without a cart, display stand or other device, and without occupying a specific location for longer that necessary to conduct a transaction."

33.    The Parks Department Commissioner's proffered purposes of the 2010 EMV rules were to "provide reasonable opportunities – by and through limited time, place and manner restrictions – for expressive matter vendors to display and sell their wares on parkland."

34.    A FAQ published by the Parks Department in June 2010 explains that the expressive matter rules apply to "anyone who sells art, photography, reading material, or sculpture whether original or mass produced."

35.    The FAQ also notes restrictions of the size of display stands to 8 feet long by 3 feet wide, and 5 feet high.

36.    The 2010 EMV rules went into effect in May 2011 after a New York State court struck down a temporary restraining order that had been effect since June 2010.

37.    In 2011, Robert Lederman and Jack Nesbitt, street artists who sell art in New York City parks, brought an action challenging the constitutionality of the 2010 EMV Rules, arguing, among many other things, that the 2010 EMV rules violated their 14th Amendment Equal Protection rights because those rules unconstitutionally singled out visual artists from other types of First Amendment protected speech, such as street performers and musicians.

38.    The 2010 EMV rules expressly applied to vendors of visual art who use display stands in City Parks, not to buskers and musicians performing in parks with open instrument cases who seek donations.

39.    Without warning in October 2011, the Parks Department issued hundreds of summonses to performers and musicians in New York City parks, particularly in Washington Square Park.

40.      Upon information and belief, The Parks Department's enforcement and intimidation campaign against the Plaintiff and other musicians and performers was directly related to the lawsuit pending against the 2010 EMV rules, and an *ad hoc* attempt to remedy the equal protection argument against the 2010 EMV rules that clearly violated street artists' and performers' rights.

41.      After a huge public outcry and extensive media coverage, the Parks Department stopped enforcing the EMV rules against performers and musicians, and many of the summonses and tickets issued against them were dismissed.

### Defendants Seek to Drive Mr. Belpasso from Battery Park

42.      In September 2011, the tenth anniversary of the September 11th attacks, Parks Enforcement Patrol ("PEP") officers began approaching Mr. Belpasso in Battery Park while he was performing there.  They demanded that he stop playing the flute and leave the park.

43.      Mr. Belpasso is aware of his First Amendment right to perform in City parks.  He consistently challenged PEP officers' legal basis for demanding that he stop performing with his flute and leave the park.

44.      On September 10, 2011, Mr. Belpasso was performing his flute near the Sphere in Battery Park.  Officer Pomposello issued a Notice of Violation ("NOV") against Mr. Belpasso for "vending expressive matter in a non designated area" and "not in the designated spot."  In the NOV, Officer Pomposello also alleged that Mr. Belpasso "took longer than necessary to conduct transaction."  The NOV states a fine of $250 for the alleged violations.

45.      Much of the September 10, 2011 NOV is illegible, and appears to cite to "1-cc(b)(3)" of the 2010 EMV Park Rules.