46.  Mr. Belpasso challenged the September 10, 2011 NOV before the Environmental Control Board ("ECB") on grounds that he was not vending "materials or objects" as defined in RCNY § 1-02. The Administrative Law Judge ("ALJ") did not rule on the merits of Mr. Belpasso's claim, but dismissed the NOV on grounds that failed to set forth a prima facie case, because the face of the summons was illegible.

47.  Subsequently, Mr. Belpasso was approached several other times by PEP officers who threatened him with more summonses and tickets if he did not leave Battery Park and move to a vending location. Despite continued threats of summonses and tickets, Mr. Belpasso continued playing his flute at the Sphere in Battery Park to mark the tenth anniversary of the 2001 tragedy, and to honor his family member and other the fallen victims.

48.  On or about October 3, 2011, Mr. Belpasso was first approached by two unnamed male Parks employees, whom he reasonably believes were either Job Training Participants (JTPs) or City Seasonal Aides (CSAs). These Parks' employees wore green shirts with Parks insignia, but they did not wear PEP officers uniforms, have badges, nor did they have patrolmen shields. They had nothing on their uniforms that would allow Mr. Belpasso to identify them.

49.  The two unknown Parks' employees confronted Mr. Belpasso, and physically intimidated him by standing behind him and kicking around the back of his ankles, even poking him the back to get him out of Battery Park.

50.  On October 15, 2011, Mr. Belpasso was playing the flute near the boat dock in Battery Park. He was approached by Officer Dorsaint and Sergeant Charlemagne.

51.  Sergeant Charlemagne demanded that Mr. Belpasso leave Battery Park, then proceeded to kick Mr. Belpasso on the lower foot near the back of his shoes, until Mr. Belpasso was outside of Battery Park. Mr. Belpasso stopped on the perimeter of Battery Park, where Sergeant

Charlemagne continued to kick the back of his feet even harder, in order to push Mr. Belpasso further away from the park.

52. After Mr. Belpasso was kicked and pushed out of Battery Park, Officer Dorsaint, under the direction of Sergeant Charlemagne, issued an NOV against Mr. Belpasso for failing to vend in a designated location in violation of "56 RCNY 105(b)," and on grounds that he occupied the location longer than necessary to conduct a transaction. Mr. Belpasso was fined $250.

53. On October 15, 2011, Officer Dorsaint, under the direction of Sergeant Charlemagne, issued another NOV against Mr. Belpasso for "failing to vend in a designated location," and on grounds that he "occupied the location longer than necessary to conduct a transaction." Mr. Belpasso was fined $250.

54. Mr. Belpasso challenged the October 15, 2011 NOV before the ECB, arguing that as a musician and flute player he was not an expressive matter vendor because he was not vending "materials or objects" as defined by RCNY § 1-02. Furthermore, Mr. Belpasso argued that he was not under the Parks Department jurisdiction, as he was fined on the perimeter of the park, and not in Battery Park itself. The ALJ did not rule on the merits of Mr. Belpasso's claims, and dismissed the October 15, 2011 NOV for failing to give proper notice to the Plaintiff, as the summons improperly cited to 56 RCNY 105(b), and not 56 RCNY § 1-05(b).

55. During September and October 2011, Mr. Belpasso was approached by Officers Dorsaint, Pomposello, Flaherty, and Iener numerous times, often at the direction of Captain Cruz who was in the vicinity, and threatened with summonses and tickets unless he stopped playing the flute and leave Battery Park.

56. On or about October 17, 2011, Mr. Belpasso was again surrounded and intimidated by two unknown Parks' employees without identification, whom he reasonably believed to be JTPs

10

or CSAs. Once again, Mr. Belpasso was kicked around the lower leg and ankles until he left the park.

57. The unnamed Parks' employees, who were usually the same three men, generally arrived at Battery Park in a van, often accompanied by Defendant Cruz.

58. After October 17, 2011, three unnamed Park's employees approached Mr. Belpasso at least once a week, usually when no other park goers where in the area. When no one was looking, the unnamed parks employees, who the plaintiff reasonably believes acted under the direction and supervision of Captain Cruz, would surround Mr. Belpasso and make threatening gestures and comments to him.

59. On more than one occasion, the unnamed parks employees kicked Mr. Belpasso around the lower part of his foot and ankles in order to remove him from Battery Park. Mr. Belpasso, fearful for his safety and physical wellbeing, would leave the park when attacked by the unnamed Parks' employees.

60. The unnamed Parks' employees never stayed in Battery Park for long periods of time. Rather, they would harass and assault Mr. Belpasso, and other performers in the Park, and then they would quickly leave Battery Park by van.

61. Nevertheless, Mr. Belpasso would return to Battery Park the next day and play his flute, as he continued to believe he had a right to do so.

62. On October 21, 2011, Officer Iener approached the Plaintiff while he was performing in Battery Park. At the direction of Captain Cruz, Officer Iener ordered Mr. Belpasso to leave the park or he would be issued an NOV.

63. Mr. Belpasso told Officer Iener that he was legally performing in Battery Park, and would challenge an NOV before the ECB and have the NOV dismissed.

11

64. Officer Iener, angered by Mr. Belpasso's persistence and refusal to give up his right to perform in Battery Park, threatened him with criminal sanctions.

65. Mr. Belpasso still refused to move or stop playing the flute. Officer Iener, at the direction of Captain Cruz, then gave Mr. Belpasso two criminal summonses, one for "unlawful vending," and a second for "failure to comply."

66. The first criminal summons for unlawful vending was dismissed by a New York City Criminal Court on January 5, 2012, on grounds that the summons was legally insufficient.

67. The second criminal summons for failure to comply was dismissed on January 11, 2012, on grounds that a legally acceptable accusatory instrument was never filed by the New York City Police Department.

68. On December 12, 2011, Mr. Belpasso was approached again by Officer Flaherty while performing at the Sphere. Officer Flaherty demanded that he leave the park and move to a vending location outside of the park. Mr. Belpasso refused and Officer Flaherty issued two NOVs against Mr. Belpasso.

69. The first NOV cited Mr. Belpasso for "unauthorized vending," stating that he was "playing a musical instrument – flute – solicit and accept donations in an unauthorized area and not in a designated spot as defined by PRR 1-05(b)(3)(ii)." The NOV further stated that Mr. Belpasso "accepted multiple donations in this spot for a period of 5 minutes." The NOV was for a fine of $250.

70. Officer Flaherty told Mr. Belpasso to move to a designated area outside of the park. Mr. Belpasso refused. Officer Flaherty then issued the second NOV for "fail to comply w. officer directive" in violation of "56 RCNY 1-03(c)(1)," and stated that "respondent refused to go to a designated EMV spot." The second NOV was for a fine of $250.

71. On or about December 18, 2011, Mr. Belpasso was performing the flute on the sidewalk adjacent to Battery Park, with his flute case open and directly in front of him.

72. Mr. Belpasso was approached by the three unnamed Parks employees, and one of them threatened that he would be arrested if he did not leave the park.

73. Mr. Belpasso refused to leave the park, and one of the unknown Parks' employees kicked his flute case so that it overturned and spilled change on the sidewalk. Mr. Belpasso went on to his hands and knees to collect the spilled change.

74. As Mr. Belpasso was collecting the change, one of the unknown Parks' employees stood by and acted as a "look out," while another one kicked him in the chest.

75. The unknown Parks employee who kicked him in the chest claimed that he "tripped" over Mr. Belpasso. These acts took place while Captain Cruz was watching from a distance. Upon information and belief, Captain Cruz directly ordered and supervised the unknown Parks' employees assault on Mr. Belpasso.

76. Mr. Belpasso immediately grabbed his case and flute and ran away, fearful of further physical assaults.

77. Soon after the December 18, 2011 incident, Mr. Belpasso avoided performing in Battery Park. Mr. Belpasso was overwhelmed by the Defendants' persistent and continuous harassment and intimidation. Mr. Belpasso has avoided returning to his spot in Battery Park near the Sphere, and now performs near Wall Street.

### The ECB upholds an illegal NOV

78. Belpasso challenged the December 12, 2011 NOVs before the ECB. A hearing was held on January 25, 2012 and the ECB incredulously upheld both NOVs.

79. The ECB glossed over the obvious fact that RCNY § 1-02 does not even mention musical performance or playing a musical instrument to uphold the first NOV for unauthorized vending, stating that RCNY § 1-02 is not exclusive and not limited to those activities listed in the regulation, namely "materials or objects with expressive content, such as newspapers, books, or writings, or visual art such as paintings, prints, or photography."

80. The ECB's unilateral expansion of the statutory language to include musical performances contravenes this Circuit's jurisprudence strictly defining "expressive matter" as wares such as "prints, painting, photographs, and sculpture" and nothing else.

81. The ECB upheld the second NOV for failure to comply, stating that "there is no evidence or testimony he [Mr. Belpasso] complied by moving to a designated spot."

82. Mr. Belpasso filed an appeal of the ECB decision with the ECB Appeals Unit on February 6, 2012.

83. Inexplicably, and contrary to the overwhelming weight of First Amendment jurisprudence in this Circuit, the ECB Appeals Unit denied Mr. Belpasso's appeal of the first NOV for unauthorized vending. The ECB Appeals Unit held that Mr. Belpasso "was vending without a permit in violation of 56 RCNY 1-05(b)" because he was "providing or offering to provide services or items in exchange for a donation." The ECB Appeals Unit held that Mr. Belpasso needed a permit, despite well established law that a person performing a musical instrument in a City park without amplification and during the daytime does not need a permit.

84. The ECB Appeals Unit ruled in favor of Mr. Belpasso's appeal of the second NOV, holding that he had no duty to comply with Officer Flaherty's order to move to an EMV spot on the perimeter of Battery Park, because as a flute player he was not an expressive matter vendor as defined under the 2010 EMV rules.

### Parks Department revises 2010 EMV rules to include performers

85. In May 2013, nearly a year and a half after the aforementioned events, the Parks Department adopted new rules [2013 revised rules] that expanded the definition of expressive matter under RCNY § 1-02 to include "entertainers."

86. In addition, the Parks Department revised RCNY § 1-05(b) prohibition on unlawful vending, to state that no person shall sell, offer, lease or let anything whatsoever, including, but not limited to goods, services, *or entertainment* [emphasis added] in exchange for a donation, except under and within the terms of a permit, or except as a otherwise provided by law.

87. With the 2013 revised rules, the Parks Department issued a FAQ [2013 FAQ] to explain how those rules would apply to musicians and performers in city parks.

88. The 2013 FAQ stated that "the Agency [Parks Department] in spring 2012 determined that it was necessary to temporarily suspend enforcing the rules against performers and clarify that the rules apply to performers and entertainers."

89. The 2013 FAQ explains that "Parks will resume applying the rules to performers and entertainers." It further states that in the four parks with designated vending spots (Union Square, Battery Park, High Line and certain portions of Central Park), performers, like other expressive matter vendors, will need to sell or solicit donations from the designated spots."

90. The 2013 revised rules do not apply to the Plaintiff's causes of action, as they were not in effect in 2011 when the NOVs and criminal summonses issued against Mr. Belpasso, and when the harassment and assaults took place.

## CAUSES OF ACTION

### COUNT ONE
### Constitutional and Civil Rights pursuant to 42 U.S.C. § 1983
### Violation of First Amendment Speech rights
### (Against all Defendants)

91. The foregoing allegations are incorporated as if re-alleged herein.

92. Battery Park is a public park and is in the public fora. Mr. Belpasso's flute playing and receiving donations in a public park is speech that enjoys the broadest protections under the First Amendment to the U.S. Constitution.

93. Mr. Belpasso did not need to obtain a permit to play his flute under the circumstances of which he was summonsed.

94. The Defendants' harassment and ticketing the Plaintiff for violations of the 2010 EMV rules constituted a singling out of the Plaintiff for enforcement under a rule that does not apply to him. As such, the application of the 2010 EMV rules to the Plaintiff was a content-based restriction that violates the First Amendment to the United States Constitution.

95. The fact that a majority of the NOVs and criminal summonses issued to Mr. Belpasso were dismissed by the ECB and New York City Criminal Court does not moot his claims. None of the NOVs or criminal summonses were dismissed on First Amendment grounds. Rather, they were dismissed on technical or procedural grounds.

96. The Defendants' consistent harassment, demands that he leave the park, and issuing of NOVs and criminal summonses against the Defendant were based on a Defendants' strong